**09-CV-05301-CMP**

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CRAIG THOMAS, | |
| Plaintiff, | No. |
| v. | COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT |
| SOUND INPATIENT PHYSICIANS, INC. and ROBERT A. BESSLER, | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(1)** |
| Defendants. | |

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT
Case No.

010100-11 293740 V1

**HB**

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................................. 2

III.   PARTIES .................................................................................................................. 3

IV.    MEDICARE BILLING FOR HOSPITALISTS ................................................... 3

       A.     The Medicare Act............................................................................................ 3

       B.     Documentation of Medical Necessity .......................................................... 5

       C.     Hospitalist Billing and Coding...................................................................... 6

       D.     The CMS Definition of Initial and Subsequent Hospital Care ................ 8

              1.     Initial hospital care................................................................................ 8

              2.     Subsequent hospital care ...................................................................... 8

       E.     The CMS Documentation Requirements for Initial and Subsequent Hospital Care9

              1.     Documentation of history....................................................................... 9

              2.     Documentation of examination ............................................................ 10

              3.     Documentation of the complexity of medical decision-making .............. 12

V.     FACTUAL BACKGROUND ................................................................................ 13

       A.     SIP's Upcoding of Hospitalist Visits ........................................................ 13

       B.     The 2008 O'Reilly Audits........................................................................... 14

              1.     Scottsdale Healthcare Osborn audit detects lack of documentation for 63% and 94% of hospitalists visits coded 99223 and 99233, respectively ....... 14

              2.     Scottsdale Healthcare SHEA audit detects lack of documentation for 57% and 85% of hospitalists visits coded 99223 and 99233, respectively ....... 15

              3.     Banner Good Samaritan Hospital audit detects lack of documentation for 70% and 78% of hospitalists visits coded 99223 and 99233, respectively15

       C.     SIP Has Recklessly or Deliberately Ignored the 2008 Audits .............. 16

              1.     SIP ignores O'Reilly's audit findings ..................................................... 16

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - i
Case No.

010100-11 293740 V1



**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

2.     SIP's coding training for physicians is patently inadequate window-dressing ................................................................................................ 18

     a.     SIP's Vice President responsible for coding training is an MBA with no medical background and is himself untrained in billing and coding................................................................................................ 18

     b.     The training available to SIP hospitalists is inadequate ................ 19

     c.     SIP had a 45-day review process for new hospitalists that provided coding feedback, but it was not used effectively and has been abandoned ................................................................................ 21

     d.     SIP's "pocket billing guides" and "Picking the Perfect Code" slide presentation ................................................................................ 21

3.     Defendant Bessler has recklessly or deliberately ignored the 2008 audits 22

D.     SIP Appears to Have the Same Upcoding Problems With Critical Care Codes ... 24

E.     Medicare and Medicaid Reimbursements to SIP ................................................... 24

COUNT I FALSE CLAIMS ACT 31 U.S.C. § 3729(A)(1) AND (A)(2) ................................... 24

PRAYER FOR RELIEF ............................................................................................................ 25

DEMAND FOR JURY TRIAL .................................................................................................. 26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - ii
Case No.

010100-11 293740 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

## I.    INTRODUCTION

1.      This is an action brought by Relator Craig Thomas on behalf of the United States to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* ("the FCA" or "the Act"), arising from a fraud upon the United States in connection with claims for Part B Medicare, Medicaid, and other government health insurance reimbursements.

2.      Defendant Sound Inpatient Physicians, Inc. ("SIP") is a Tacoma, Washington company that employs hospitalists and contracts their services to hospital systems. Mr. Thomas, who is not a physician, joined SIP as Regional Manager for the Southwest Region in November 2008.

3.      Upon joining SIP, Mr. Thomas discovered that earlier in 2008 SIP performed internal audits of hospitalist billing at hospitals throughout its four regions. The audits showed widespread upcoding, *i.e.*, physician coding of patient encounters at levels higher than supported by the corresponding medical records. For example, in the Southwest Region, the audits showed that between 57% and 94% of the highest level reimbursement claims for the two most common types of patient visits were unsupported by medical documentation.

4.      In the ensuing months, Mr. Thomas learned that senior executives at SIP knew about the audit results. Mr. Thomas personally raised the audit results with SIP's President and Chief Executive Officer, defendant Robert A. Bessler, M.D. In response, Bessler ordered budget planning changes that reduce SIP's *projected* revenue, but he directed no changes that would alter hospitalist coding practices. Since then, Bessler has received monthly reports that reflect continued unusually high coding levels and revenue beyond budget.

5.      Since the audits, SIP has not implemented any coding training for staff hospitalists, reported to Medicare that the bills it submitted were inflated, or sought to reimburse Medicare or Medicaid for past overpayments.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 1
Case No.

010100-11 293740 V1

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1      6.     SIP does not have a compliance program or compliance standards applicable to

2  coding.  It does not have a coding department, nor does it utilize trained experts to review

3  physician coding.  SIP's hospitalist compensation structure rewards high codes while ignoring

4  quality assurance.

5      7.     Despite relying entirely on hospitalists to perform coding, SIP has placed a person

6  with no medical background and no training in health care billing or coding in charge of

7  hospitalist training.  As a result, SIP's coding training is window dressing that is patently

8  inadequate to prevent SIP hospitalists from continuing to code patient visits at improperly high

9  levels.

10      8.     Mr. Thomas seeks through this action to recover damages and civil penalties

11  arising from defendants' making or causing to be made false or fraudulent records, statements

12  and/or claims in connection with false or fraudulent claims for Medicare, Medicaid, and other

13  federal health insurance reimbursement to the United States.

14            **II.    JURISDICTION AND VENUE**

15      9.     This Court has jurisdiction over the subject matter of this action pursuant to 28

16  U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this

17  Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Relator establishes subject

18  matter jurisdiction under 28 U.S.C. § 3730(b).  Under 31 U.S.C. § 3730(e), there has been no

19  statutorily relevant public disclosure of the "allegations or transactions" in this Complaint for

20  which Relator is not an "original source."  Prior to filing this complaint, Relator voluntarily

21  provided the United States Attorney's Office for the Western District of Washington the

22  information contained in this Complaint.

23      10.    This Court has personal jurisdiction over defendants pursuant to 28 U.S.C.

24  § 1391(b) and 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process

25  and because defendants have minimum contacts with the United States.

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 2
Case No.
010100-11 293740 V1

**HB**

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

11.   Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because defendants can be found in, reside, and transact business in the Western District of Washington. At all times relevant to this Complaint, defendant SIP maintained its headquarters and regularly conducted substantial business within the Western District of Washington.

### III.   PARTIES

12.   Relator Craig Thomas ("Relator") is a resident of the State of Arizona. Since November 2008, Relator has been employed by defendant Sound Inpatient Physicians, Inc. as the Regional Manager for their Southwest Region. In his capacity as Regional Manager, Relator is privy to certain of SIP's billing practices throughout its four regions.

13.   Defendant Sound Inpatient Physicians, Inc. is a provider of inpatient care through staff hospitalists. Its operations are divided into four regions, Pacific, Rocky Mountain, Northwest, and Southwest. SIP's website states that it "operates a unique hospitalist model that focuses on investing in, training and supporting its hospitalist physicians." It is a Delaware corporation headquartered in Tacoma, Washington.

14.   Defendant Robert A. Bessler, M.D. is President and Chief Executive Officer of SIP. Bessler resides in Tacoma, Washington.

### IV.   MEDICARE BILLING FOR HOSPITALISTS

**A.   The Medicare Act**

15.   Congress enacted the Medicare Health Insurance for the Aged Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Act, in 1965. Medicare is a federal program administered by the Center for Medicare and Medicaid Services (CMS), an agency of the U.S. Department of Health and Human Services (HHS). It is funded through the U.S. Treasury, in part by premiums, compulsory payroll taxes, and other payments made by or on behalf of its beneficiaries. All people 65 or older, certain disabled individuals, and patients with end-stage renal disease are eligible for Medicare benefits, regardless of their individual financial circumstances.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 3
Case No.

010100-11 293740 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

16.    The Medicare program pays for medical services under two separate systems, from two separate trust funds. Hospital, skilled nursing facility, and institutional insurance benefits are paid for under Part A of the program, through a system administered by Medicare "intermediaries." 42 U.S.C. § 1395c - 1395i-2. Part A is financed by compulsory payroll taxes, which are directed to the federal hospital insurance trust fund. 42 U.S.C. § 1395g. Other medical insurance benefits are paid for under Part B of the program, through a system administered by Medicare "carriers." 42 U.S.C. §§ 1395k, 1395l, 1395x(s). General Part B benefits cover a wide array of medical services and devices, including physician, ambulance, outpatient hospital, and laboratory services, durable medical supplies, diagnostic tests, and other non-institutional health services. Part B benefits are financed by general federal revenues and premiums paid by enrollees, directed into the supplemental medical insurance trust fund. 42 U.S.C. § 1395t.

17.    Section 1862(a)(1)(A) of the Act, 42 U.S.C. §§ 1395y, states that "no payment may be made under Part A or Part B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member...."

18.    The physician fee schedule is the basis for Medicare reimbursement for all physician services beginning in January 1992. 42 U.S.C. §§ 1395w-4(a)(1). Section 1848(c)(5) of the Act required the Secretary of HHS to develop a uniform coding system for all physician services. 42 U.S.C. §§ 1395w-4(c)(5). The American Medical Association's "Current Procedural Terminology" ("CPT") maintains a numeric coding system for physicians' services. In 1983, CMS adopted the CPT as part of Medicare Healthcare Common Procedure Coding System (HCPCS) and mandated the providers use HCPCS to report physician services to Medicare.

19.    CMS issues binding guidance to its carriers in the form of claims processing manuals and memoranda.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 4
Case No.

010100-11 293740 V1

**HB**

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

**B.     Documentation of Medical Necessity**

20.     Section 1833(e) of the Act requires that providers furnish "such information as may be necessary in order to determine the amounts due" to receive Medicare payment.  42 U.S.C. §§ 1395l.  Claims for services that lack sufficient documentation to show that care was provided at the level for which reimbursement is sought do not meet the requirements of section 1833(e).

21.     Medical record documentation is required to record pertinent facts, findings, and observations about an individual's health history, including past and present illnesses, examinations, tests, treatments, and outcomes.  The medical record chronologically documents the care of the patient and is an important element of contributing to high quality care.

22.     The medical record serves as the legal document to verify the care provided.  *See* 42 C.F.R. § 482.24(c).  Documentation is the source of accurate Medicare insurance claim review and payment.

23.     Under CMS requirements, the documentation of each patient encounter should include:

- the reason for the encounter and relevant history, physical examination findings, and prior diagnostic test results;
- the assessment, clinical impression, or diagnosis;
- a plan for care; and
- the date and legible identity of the observer.

24.     CMS requires that the CPT codes reported on the health insurance claim or billing statement be supported by the documentation in the medical record.

25.     The HHS Office of Inspector General has found repeated problems with lack of documentation suggesting physician upcoding for hospitalist services.  *See* Final Report of Improper Fiscal Year 2002 Medicare Fee-for-Service Payments (A-17-02-02202), from Janet Rehnquist, Inspector General, to Thomas Scully, Administrator, Centers for Medicare and

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 5
Case No.

010100-11 293740 V1

**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    Medicaid Services (Jan. 16, 2003), at 11, (for 76.3% of reviewed patient encounters coded as

2    99233 and 36.7% coded as 99232, documentation did not support level of services coded, so

3    services billed were not medically necessary); Final Report of Improper Fiscal Year 2001

4    Medicare Fee-for-Service Payments (A-17-02-02202), from Rehnquist to Scully (Feb. 15, 2002),

5    at 12 (for 42% of reviewed patient encounters coded as 99233, documentation did not support

6    level of services coded); Final Report of Improper Fiscal Year 2000 Medicare Fee-for-Service

7    Payments (A-17-02-02202), from Michael F. Mangaro, Acting Inspector General, to Michael

8    McMullan, Acting Principal Deputy Administrator, Centers for Medicare and Medicaid Services

9    (Feb. 5, 2002), at 12 (for 49% of reviewed patient encounters coded as 99233, documentation did

10   not support level of services coded).

11       26.     CMS has determined that physician coding deficiencies have and continue to cost

12   taxpayers tremendous amounts of money. *See* Centers for Medicare and Medicaid Services,

13   Improper Medicare Fee-For-Service Payments Report – November 2007 Report (in 2007 alone,

14   projecting improper payments of $200 million for undocumented patient encounters coded as

15   99233, $97 million for encounters coded as 99223, $79 million for encounters coded as 99232,

16   $36 million for encounters coded as 99291, and $23 million for encounters coded as 99222).

17   **C.     Hospitalist Billing and Coding**

18       27.     Hospitalists typically bill using CPT codes for patient "evaluation and

19   management services."

20       28.     These include CPT 99221-99223 (initial hospital care services), CPT 99231-

21   99233 (subsequent hospital care), and CPT 99291-99292 (critical care services). Each of these

22   three groups of codes has three levels, for low, moderate, and high complexity. Thus, CPT

23   99221 is a low complexity initial encounter, CPT 99222 is one of moderate complexity, and CPT

24   99223 is an initial encounter of high complexity.

25       29.     Hospitalists also typically bill for two other types of patient encounters, consults

26   and observations.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 6
Case No.

010100-11 293740 V1

**HB**

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1     30.    CMS has issued specific guidance to physicians for billing and documentation of

2    evaluation and management services in a publication named the Claims Processing Manual, Pub.

3    100-04, Ch. 12, § 30.6.

4     31.    The Medicare Claims Processing Manual states that the Act's medical necessity

5    requirement obligates physicians to bill at the lowest level of evaluation and management

6    services that is warranted.  Medicare Claims Processing Manual, § 30.6.1(A).  Likewise, to bill

7    the highest levels of evaluation and management codes, the services furnished must meet the

8    definition of the code.  Medicare Claims Processing Manual, § 30.6.1(D).

9     32.    Furthermore, the documentation prepared by the physician must justify the chosen

10    level of service.  The Manual states: "Medical necessity of a service is the overarching criterion

11    for payment in addition to the individual requirements of a CPT code.  It would not be medically

12    necessary or appropriate to bill a higher level of evaluation and management service when a

13    lower level of service is warranted…. Documentation should support the level of service

14    reported." Medicare Claims Processing Manual, § 30.6.1(A).

15     33.    CMS has prescribed specific documentation requirements for physicians.

16    "Physicians … are required to use the 1995 and 1997 E/M documentation guidelines to

17    document the medical record with the appropriate clinical information." Medicare Claims

18    Processing Manual, § 30.6.1(F).

19     34.    The 1997 publication, entitled "1997 Documentation Guidelines for Evaluation

20    and Management Services," sets out detailed guidance for physicians who are coding evaluation

21    and management services.

22     35.    Billing for each of the types of services at issue here – initial hospital care,

23    subsequent hospital care, and critical care – involves an analysis of three key components,

24    patient history, patient examination, and medical decision-making.  "Because the level of

25    [evaluation and management] service is dependent on two or three key components, performance

26    and documentation of one component (*i.e.*, examination) at the highest level does not necessarily

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 7
Case No.

010100-11 293740 V1

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    mean that the encounter in its entirety qualifies for the highest level of [evaluation and

2    management] service." 1997 Documentation Guidelines for Evaluation and Management

3    Services, at 4.

4    **D.**      **The CMS Definition of Initial and Subsequent Hospital Care**

5        **1.**      **Initial hospital care**

6        36.      A hospitalist may code a patient's initial hospital care using CPT codes 99221,

7    99222, or 99223.  These codes have the following definitions:

8        37.      CPT 99221 requires documentation of the following three key components:

9        •      A detailed or comprehensive history;

10        •      A detailed or comprehensive examination;

11        •      Medical decision-making that is straightforward or of low complexity.

12        38.      CPT 99222 requires documentation of the following three key components:

13        •      A comprehensive history;

14        •      A comprehensive examination;

15        •      Medical decision-making that is of moderate complexity.

16        39.      CPT 99223 requires documentation of the following three key components:

17        •      A comprehensive history;

18        •      A comprehensive examination;

19        •      Medical decision-making that is of high complexity.

20        **2.**      **Subsequent hospital care**

21        40.      A hospitalist may code a patient's subsequent hospital care using CPT codes

22    99231, 99232, or 99233.  These codes have the following definitions:

23        41.      CPT 99231 requires documentation of the following three key components:

24        •      A problem focused interval history;

25        •      A problem focused examination;

26        •      Medical decision-making that is straightforward or of low complexity.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 8
Case No.

010100-11 293740 V1



42.   CPT 99232 requires documentation of the following three key components:

- An expanded problem focused interval history;

- An expanded problem focused examination;

- Medical decision-making that is of moderate complexity.

43.   CPT 99233 requires documentation of the following three key components:

- A detailed interval history;

- A detailed examination;

- Medical decision-making that is of high complexity.

**E.   The CMS Documentation Requirements for Initial and Subsequent Hospital Care**

**1.   Documentation of history**

44.   The level of evaluation and management services a physician may code is based in part on the extensiveness of the patient history he or she takes.  There are four types of history, Problem Focused, Expanded Problem Focused, Detailed, and Comprehensive.  In order to code a visit at the highest level (*e.g.*, 99223 or 99233), the history the physician takes from the patient and records on the patient's chart must be Comprehensive.

45.   Each type of history includes some or all of the following elements:

- chief complaint;

- history of present illness;

- review of systems; and

- past, family, and/or social history.

46.   Only if the physician (i) takes an ***extended*** history of the patient's present illness and (ii) performs a ***complete*** review of body systems and a ***complete*** past history is the overall history deemed Comprehensive.  Only in this instance may the physician code a visit at the highest level.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 9
Case No.

010100-11 293740 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

47.     To determine whether the physician has taken the types of history that qualifies for coding at a lower or higher level, he or she (as well as any auditor) must follow concrete, easy-to-follow criteria, which are set out in the 1997 Documentation Guidelines.

48.     There are eight elements of a present illness that a physician can assess, things such as duration, location, and severity. An *extended* history of present illness occurs when the physician considers and documents at least four of these elements.

49.     A review of body systems is a series of questions the physician asks to identify signs or symptoms of illness. A *complete* review of systems inquires about the systems directly related to the problems identified in the history of present illness, plus all additional systems. The physician must document review of at least ten organ systems to qualify for a complete review of systems.

50.     A past history is a patient's past experiences with illnesses, operations, injuries, and treatments. A family history is a review of medical events in the patient's family. A social history is an age appropriate review of past and current activities. A *complete* past, family, and/or social history generally requires a review of all three history areas (although in limited circumstances a review of two history areas will suffice). A physician must document at least one specific item from each of the three history areas to take a complete past, family, and/or social history.

**2.     Documentation of examination**

51.     As with the patient's history, the levels of evaluation and management services provided are based in part on four possible types of physical examination, Problem Focused, Expanded Problem Focused, Detailed, and Comprehensive. In order to code a visit at a higher level (*e.g.*, 99223 or 99233), the examination the physician conducts and records on the patient's chart must be Comprehensive.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 10
Case No.

010100-11 293740 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

52.     A Problem Focused examination is a *limited* examination of the affected body area or organ system.  An Expanded Problem Focused examination adds a limited review of any other symptomatic or related body areas or organ systems.

53.     A Detailed examination is an *extended* examination of the same body areas and symptoms as an Expanded Problem Focused examination.  Finally, a Comprehensive examination is a general multi-system examination, or a complete examination of a single organ system and other symptomatic or related body areas or organ systems.

54.     The 1997 Documentation Guidelines identify eleven body or organ systems that are included in a general multi-system examination.  They are:  cardiovascular; ears, nose, mouth, and throat; eyes; genitourinary (male or female); hematologic/lymphatic/immunologic; musculoskeletal; neurological; psychiatric; respiratory; and skin.

55.     The 1997 Documentation Guidelines provide further guidance on the elements of an examination of the body systems identified above.  These elements are identified in a chart, in bullets.  Thus, for example, the possible elements of an eye examination performed as part of a general multi-system examination are:

- Inspection of conjunctivae and lids;
- Examination of pupils and irises;
- Ophthalmoscopic examination of optic discs.

56.     The 1997 Documentation Guidelines provide physicians very specific directives for determining the difference between a Problem Focused, Expanded Problem Focused, Detailed, and Comprehensive physical examination.  The complexity of the coding level is dictated by the extensiveness of the examination.

57.     Thus, a Problem Focused examination involves – and must include documentation of – less than six elements identified by bullet.  An Expanded Problem Focused examination must involve and document at least six elements or bullets.  A Detailed examination must involve and document either at least two elements from each of six body areas or systems

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 11
Case No.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1   or at least twelve elements in two or more areas/systems. Finally, a Comprehensive multi-

2   system examination must involve *all* elements in at least nine organ systems and document at

3   least two elements from all nine or, for a single organ system examination, *all* elements of that

4   system.

5       58.     In short, if a physician performing a multi-systems examination has not examined

6   *all* listed elements in at least nine organ systems and documented at least two elements from

7   each, he or she may not use a code that requires a Comprehensive examination. Likewise, if the

8   physician is performing a single-system examination, he or she must examine and document *all*

9   elements of that system to use a code requiring a Comprehensive examination.

10      **3.     Documentation of the complexity of medical decision-making**

11      59.     The final factor that determines the levels of evaluation and management services

12  provided is the type of medical decision-making required by the patient encounter. The 1997

13  Documentation Guidelines recognize four types of medical decision-making – straight-forward,

14  low complexity, moderate complexity, and high complexity. In order to code a visit at a higher

15  level (*e.g.*, 99223 or 99233), it must involve high complexity medical decision-making.

16      60.     Three measures contribute to the complexity of medical decision-making. They

17  are the number of diagnoses or management options the physician considers; the amount of

18  complexity of data the physician must review; and the risk presented by the patient's condition.

19  Only two – not all three – of these measures must match the level of decision-making the

20  physician assigns in determining the proper code.

21      61.     Thus, for medical decision-making to be considered of low complexity, two of

22  these three measures – number of diagnoses, complexity of data, and risk – would be limited or

23  low. In contrast, for medical decision-making to be considered of high complexity, two of the

24  three measures would be extensive or high. Further, the physician must document this.

25      62.     The first measure is the number of diagnoses or management options the

26  physician considers. This is based on the number and types of problems addressed during the

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 12
Case No.

010100-11 293740 V1

**HB**

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1   encounter, the complexity of establishing a diagnosis, and the management decisions that are

2   made by the physician.  For each patient encounter, the physician is required to document an

3   impression or diagnosis, treatment decisions, and referrals or consultations requested.

4       63.     The second measure is the amount or complexity of data the physician must

5   review.  This is based on the types of diagnostic testing ordered or reviewed.  A decision to

6   obtain and review old medical records or obtain history from a source other than the patient

7   increases the amount and complexity of data to be reviewed.  The 1997 Documentation

8   Guidelines require the physician to document tests ordered, labs reviewed, and physician

9   analyses of such information.

10      64.     The third measure, risk of significant complications, morbidity, or mortality, is

11  based on the risks associated with the presenting problems, the diagnostic procedures, and the

12  possible management options.  The physician is required to document co-morbidities and

13  surgical or invasive procedures planned or scheduled to justify high-risk medical decision-

14  making.

15              **V.      FACTUAL BACKGROUND**

16  **A.      SIP's Upcoding of Hospitalist Visits**

17      65.     Hospitalists are hospital-based general physicians.  Hospitalists assume the care

18  of hospitalized patients in the place of patients' primary care physicians.

19      66.     SIP hospitalists are paid based on the revenue they generate for the SIP practice.

20  Consequently, the higher code a physician bills, the higher is his or her income.  SIP physicians

21  have a non-guaranteed "draw" and then receive a percentage above the draw of the net

22  reimbursements SIP receives (or, in some locations, a proxy based on the Medicare allowable)

23  for their services.  If physicians do not meet the draw, SIP recoups losses through lowering their

24  draw until the losses are recouped.

25      67.     This same incentive exists for SIP executives, including defendant Bessler.  If

26  SIP's corporate auditing, physician coding review, and training systems facilitate billing at high

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 13
Case No.

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1  codes, SIP's revenue increases.  And if SIP's corporate auditing, physician coding review, and

2  training systems fail to detect and prevent billing at codes not supported by the patient visit,

3  revenues also increase.  This latter circumstance is precisely what SIP knowingly has allowed to

4  occur.

5  **B.**    **The 2008 O'Reilly Audits**

6        68.    In summer 2008, SIP internal auditor Carla O'Reilly, a registered nurse and

7  Clinical Review Specialist, audited the coding done by SIP hospitalists at three hospitals in SIP's

8  Southwest Region during the month of January 2008.  For each hospital, O'Reilly randomly

9  selected the charts for three initial visits and three follow-up visits for each SIP hospitalist.

10  O'Reilly obtained and analyzed all patient records associated with each visit, from both SIP and

11  the hospitals themselves.  Each audit showed a remarkably high level of upcoding, as detailed

12  below.  For each patient encounter, O'Reilly identified the basis for her audit conclusions,

13  including factors such as the physician having reviewed less than ten systems, the family history

14  not meeting the required level, and missing family histories altogether.

15        1.    **Scottsdale Healthcare Osborn audit detects lack of documentation for 63%**
                **and 94% of hospitalists visits coded 99223 and 99233, respectively**

16        69.    One of the audits performed by O'Reilly was of the codes billed by hospitalists at

17  SIP facility Scottsdale Healthcare Osborn.  This audit analyzed 30 initial visit patient encounters

18  and 27 follow-up visit patient encounters, for a total of 57 patient encounters.  O'Reilly analyzed

19  the patient visits of 10 SIP hospitalists.

20        70.    For the initial visits, none were coded as a basic visit (CPT 99221).  Only three

21  were coded as intermediate complexity (CPT 99222).  Twenty-seven were coded as most

22  complex (CPT 99223).  Of these 27, 17 – or 63% – were determined to be unsupported by the

23  documentation in the patient's records.

24        71.    Of the follow-up visits, only three were coded as least complex (CPT 99321).  Six

25  were coded as of intermediate complexity (CPT 99232); however, of these, the auditor

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 14
Case No.
010100-11 293740 V1

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

determined that half were unsupported by the documentation. Eighteen were coded as most complex (CPT 99233). The auditor concluded that only a single one of these asserted complex visits was supported by the accompanying documentation. For the highest complexity visits, a full 94% were upcoded and reimbursed by the payor at too high of a level.

**2.      Scottsdale Healthcare SHEA audit detects lack of documentation for 57% and 85% of hospitalists visits coded 99223 and 99233, respectively**

72.      Another of O'Reilly's audits was of the codes billed by hospitalists at SIP facility Scottsdale Healthcare SHEA. This audit analyzed a total of 30 patient encounters, evenly divided between initial and follow-up visits. The patient visits of 5 SIP hospitalists were analyzed.

73.      For the 15 initial visits, none were coded as a basic visit (CPT 99221), and only one was coded as an intermediate visit (CPT 99222). The remaining 14 visits were coded as complex (CPT 99223). Of these, the auditor determined that only six of the 14 (43%) patient encounters were properly coded. Five – or 36% – were determined to be unsupported by the documentation in the patients' records. For 3 more, the internal reviewer could not find any documentation at all.

74.      Of the 15 follow-up visits, again none were coded as least complex (CPT 99321). Two were coded as of intermediate complexity (CPT 99232), but the auditor determined that neither of these was supported by the documentation. Of the 13 coded as high complexity, 11 – 85% – were not supported by documentation. Nine were coded above the supporting documentation, and for two the auditor found no documentation at all.

**3.      Banner Good Samaritan Hospital audit detects lack of documentation for 70% and 78% of hospitalists visits coded 99223 and 99233, respectively**

75.      The third audit O'Reilly performed in summer 2008 was of the codes billed by hospitalists at Banner Good Samaritan Hospital, another facility at which Sound has provided hospitalist services. This audit analyzed a total of 85 patient encounters, 42 of which were initial visits and 43 follow-up visits. The coding of 15 SIP hospitalists were analyzed.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 15
Case No.

010100-11 293740 V1

**HB**

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

76.     For the initial visits, none were coded as a basic visit (CPT 99221). Two were coded as intermediate complexity (CPT 99222). Both of these, however, were unsubstantiated by the documentation. The remaining 40 initial visits were coded as most complex (CPT 99223). Of these, only 12, or 30%, were supported by documentation. Sixteen were coded above the available documentation and 12 had no corresponding documentation.

77.     The follow-up visits were similarly upcoded. None were coded as least complex (CPT 99321). Six were coded as of intermediate complexity (CPT 99232), and these were not upcoded. Of the 37 coded as most complex (CPT 99233), however, 26 – or 78% – were determined to be unsupported by the documentation. Further, six of the visits involved no associated documentation, and the auditor determined that only five were supported by the documentation.

**C.     SIP Has Recklessly or Deliberately Ignored the 2008 Audits**

    **1.     SIP ignores O'Reilly's audit findings**

78.     In one of his first responsibilities as Regional Operations Director, Relator attended a company orientation in Tacoma from November 17-19, 2008. During this time, he attended a lunch meeting with Randy H. Schumacher, SIP Vice President of Training and Development (sometimes referred to as Vice President of Organizational Development), and Maude Lasley, Executive Vice President of Hospital Services.

79.     At Relator's initial lunch, Schumacher informed him that SIP had conducted coding audits during the previous year throughout all of its regions that indicated a "60% error rate." Schumacher stated that SIP had not addressed the audit results.

80.     Even up to the present, SIP has not disclosed the 2008 audit results to Medicare, sought to reimburse the Government for the overpayments, conducted audits in the Southwest Region of additional periods than the one month analyzed, or taken any proactive steps to prevent the upcoding from continuing in the future.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 16
Case No.

010100-11 293740 V1



81.     Upon returning to SIP's Southwest Region headquarters on November 20, 2008, Relator expressed his concerns to the (now former) Southwest Region Medical Director, Dr. Ron Ruiz. Relator stated that SIP's audit revealed widespread coding at levels above that supported by medical documentation, but that the organization lacked adequate processes to study, correct, or prevent the problems. Ruiz acknowledged the existence of the O'Reilly audits but said he doubted their accuracy. As a result, he had not acted on the results.

82.     On December 17, 2008, Relator participated in a weekly management meeting for the Southwest region conducted by Ruiz. Relator presented O'Reilly's audit results to the SIP Chief Medical Officers for the hospitals at which physicians' coding had been audited. This included Dr. Chris Pruitt for Banner Good Samaritan and Dr. Dan Beruti for Scottsdale Healthcare. Neither Pruitt nor Beruti had been aware of the O'Reilly audits until Relator brought them to their attention.

83.     In a telephone call with Schumacher and O'Reilly on December 15, 2008, Relator requested that SIP provide compliance training to address the coding and billing errors found in the 2008 audits. Schumacher agreed that O'Reilly would visit SIP's Southwest Region to conduct training on proper coding for SIP hospitalist staff. Schumacher, O'Reilly, and Relator agreed to review the audit results with Pruitt and Beruti during a weekly management meeting.

84.     Neither this training nor the review of the audit results took place. During the telephone conference call, Dr. Scott Smith, SIP's corporate Chief Medical Officer, entered Schumacher's office and stated that allocating O'Reilly's time in this way was not a necessary use of resources. Instead, he directed Relator simply to advise Southwest Region physicians to document better. In addition, during this phone call Smith disclosed SIP's decision to abandon the 45-day review process that it utilized to review new physicians' performance.

85.     Despite the evidence of systemic upcoding by SIP physicians, SIP has refused to implement any systematic coding training for its hospitalists, whether new or experienced physicians. It also has refused to implement a company compliance plan containing standards

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 17
Case No.

010100-11 293740 V1

**HB**

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    and procedures for effectively communicating physicians' legal obligations under applicable

2    federal health care program requirements.

3        86.    There is off-the-shelf billing and coding software available to SIP that would

4    ensure that, before a bill is submitted, it complies with CMS's coding requirements. Despite the

5    O'Reilly audit findings, SIP does not use such software to support physicians' compliance with

6    their obligations under federal health care program requirements.

7        87.    To the contrary, SIP has failed to use resources available to it to educate

8    physicians on coding requirements. SIP has a strategic partnership with Milliman Care

9    Guidelines through which it gets software to increase the proficiency of physician

10   documentation. Rather than using the software to educate physicians on coding compliance,

11   however, it uses it as a marketing tool. SIP has implemented the Milliman software at select

12   sites within each of its regions. SIP has focused on using the software to increase the Case Mix

13   Index for selected high frequency and/or high-cost Diagnosis Related Groups at hospital sites. It

14   also has used it to reduce the length-of-stay for marketing SIP's services to managed care

15   companies. It has not used the Milliman software as a physician billing or coding education

16   application.

17       **2.    SIP's coding training for physicians is patently inadequate window-dressing**

18           **a.    SIP's Vice President responsible for coding training is an MBA with
               no medical background and is himself untrained in billing and coding**

19

20       88.    SIP Vice President for Training and Development, Randy H. Schumacher, is

     responsible for SIP's physician training.
21

22       89.    Schumacher is not a physician or nurse, nor is he certified in coding.

23   Schumacher's previous employment involved training and recruiting for naval pilots. Before

     joining SIP, he did not have experience in medical billing or coding. Schumacher is unqualified
24
     to develop a billing and coding training program for a large hospitalist practice group, yet SIP
25
     has charged him, and continues to charge him, with doing so.
26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 18
Case No.

010100-11  293740 V1

**HB**

**HAGENS BERMAN
SOBOL SHAPIRO LLP**

1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1          **b.     The training available to SIP hospitalists is inadequate**

2          90.     SIP does not have a written compliance program or written compliance standards

3   that address coding.  It does not have a compliance officer or contact.  It does not offer open

4   lines of communication for employees to raise detected offenses.

5          91.     SIP does not provide regular, live training on coding for newly hired hospitalists.

6   Relator has tried to schedule compliance training for new hospitalists in his region, without

7   success.  He interacts with doctors who have been employed for 23 months and who never have

8   received coding training.  On numerous occasions, Schumacher (who himself is unqualified) has

9   agreed to give and then cancelled training because the expected turn-out was less than four

10  physicians.

11         92.     SIP has a training program on an intranet website available to its hospitalists.

12  This training program contains some information on coding.

13         93.     SIP hospitalists are not required to access this training.

14         94.     SIP does not provide paid time for hospitalists to take coding training.

15         95.     SIP does not monitor and report to the physicians or their supervisors whether

16  hospitalists have taken the training.

17         96.     SIP calls its training intranet site the "SIP Hospitalist Institute."  SIP's website

18  states

19             Sound provides in-depth orientations and trainings in … the
               business of medicine with all physicians trained in our state-of-the-
20             art web-based application….  Sound is a learning organization that
               supports and cultivates cross-team networking to build and
21             disseminate hospital medical and practice knowledge….  This
               expanding knowledge base far exceeds what is available to
22             individually-run hospitalist practices.  Sound is destined to set the
               standard among hospitalist organizations.
23
           97.     The website continues that, through the SIP Hospitalist Institute's "Professional
24
    Fee Compliance Program," SIP "ensures accurate coding by hospitalists, identifies outliers for
25
    ongoing education and refinement while ensuring compliance with regulations."
26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 19
Case No.

010100-11 293740.V1

**HB**

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

98.     SIP's coding training on its intranet has inadequate information about billing and coding to apprise hospitals how to properly code patient encounters.

99.     In one set of slides on SIP's training intranet, called "Professional Fee Coding – Overview," a series of 17 PowerPoint slides identify the different code numbers that hospitalists use and state what the codes represent (*e.g.*, "F1 ... Follow-up visit inpatient status codes ... (99321 – Low Complexity"). However, apart from stating "low," "moderate," or "high" complexity, the slides do not explain the differences in patient encounters that warrant using a lower or higher code. Similarly, a coding spreadsheet identifies the various codes but does not inform the physician when to use a lower code rather than a higher code.

100.    Three other documents on SIP's training intranet list the body systems a hospitalist can review in a physical examination and define the terms used in making coding decisions. Again, however, these documents do not explain when a higher or lower level code is appropriate.

101.    A fourth document on the intranet site, called "Billing Examples," lists eight examples of patient encounters, but it does not state the appropriate code for any of the encounters.

102.    SIP does not have certified coders who assist hospitalists in determining the proper code. This responsibility is left to the physician. SIP has an internal review process for physician charge data. This process, however, does not review code selection; instead, it corrects errors such as missing demographic or billing field data.

103.    SIP outsources administration of reimbursement claim processing to a company named MedData. MedData does not engage in a review of medical records to ensure proper coding.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 20
Case No.

010100-11 293740 V1

HB

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1          **c.    SIP had a 45-day review process for new hospitalists that provided coding feedback, but it was not used effectively and has been abandoned**

2

3        104.   In November 2008, O'Reilly performed a 45-day feedback process for two new

4    SIP hospitalists working at Scottsdale Healthcare Osborn. For the first physician, Annuradha

5    Godavari, O'Reilly randomly selected three initial visits, three follow-up visits, and two

6    discharge visits. After reviewing the documentation supporting the CPT codes assigned by

7    Dr. Godavari, O'Reilly determined that 50% of them were improperly upcoded. For the second

8    physician, Dr. Srinivasareddy Vuyyuru, O'Reilly selected ten visits, three initial visits, three

9    follow-up visits, two discharge visits, and one consultation and critical care visit. After

10   reviewing all pertinent documentation, O'Reilly determined that 70% of the charges assigned by

11   Dr. Vuyyuru were improperly upcoded.

12       105.   Despite the existence of these reviews, SIP had ineffective systems in place

13   (including no compliance standards) to counsel or follow-up with the physicians to ensure they

14   avoided upcoding in the future.

15       106.   Rather than using these 45-day reviews as a tool to correct upcoding, SIP has now

16   discontinued the 45-day reviews.

17          **d.    SIP's "pocket billing guides" and "Picking the Perfect Code" slide presentation**

18

19       107.   In or about March 2009, after Relator's repeated warnings about SIP's

     compliance problems, SIP added two new documents to its intranet training site.

20

21       108.   Schumacher prepared drafts of 3x5-inch cards (called "pocket billing guides") he

22   intended physicians to carry with them. These cards were distributed initially only to chief

23   medical officers. However, the medical officers concluded that the cards were difficult to read

24   and understand and returned them to Schumacher for revision without distributing them to

     hospitalists. The cards remain in draft form unused by SIP physicians.

25

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 21
Case No.

010100-11 293740 V1

**HB**

**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

109.     Schumacher also added a slide presentation called "Picking the Perfect Code." These slides contain more detailed information on how hospitalists can decide the proper level at which to code an encounter. However, the information still is presented in a confusing form. Further, in practice the slides are not accessed or used by SIP hospitalists.

**3.     Defendant Bessler has recklessly or deliberately ignored the 2008 audits**

110.     On at least three occasions, Relator has confronted the Chief Executive Officer of SIP, defendant Bessler, about SIP's upcoding. In each instance, Bessler disregarded the coding errors and neglected demands from Relator for coding training.

111.     On December 8, 2008, Relator presented the first draft of the FY09 budget for the SIP Southwest Region via a video conference call with Bessler. During the review meeting, Bessler stated that the Work Relative Value Unit ("WRVU") values in the program SIP ran at both Scottsdale Healthcare – Osborn and Banner Good Samaritan Hospital were "too high."

112.     WRVU values are a measure of the financial value of the services provided by a physician or physician practice. One reason WRVU values may be too high compared to CMS benchmarking data is upcoding, *i.e.*, physicians are coding patient encounters at higher levels than average similar encounters reported to CMS. Bessler recognized this. During the December 8 budget review, Bessler referred to the June 2008 coding audit and characterized the audit results as support for his comment that the WRVU/encounter data was excessive.

113.     Bessler directed Ruiz, the responsible Chief Medical Officer, to reduce the budgeted WRVU values in the FY09 budget. This budget created goals for the Southwest Region. Bessler's instructions, however, were not designed to, and did not, have an impact on physician coding. Reducing WRVUs can create the appearance that coding levels have dropped (at least in budgets), but absent actual intervention with the hospitalists real coding levels would remain the same. On December 16, 2008, the SIP Chief Financial Officer, Sean Lyman, and Bessler finalized the FY09 budget for the Southwest Region, as edited by Ruiz, with the reduction of budgeted WRVUs at both facilities.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 22
Case No.
010100-11 293740 V1

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1         114.    During the budget development process, Bessler did not direct physician training
2   on proper coding or order his staff to report the upcoding to and reimburse CMS.

3         115.    Since December 2008, Bessler has received monthly profit and loss statements for
4   the Southwest Region that show WRVU levels. These statements have shown that WRVUs have
5   remained at approximately 2.45, above the budgeted level of 2.25. Despite these monthly alerts
6   of continued unusually high financial return for the services provided by Southwest Region
7   hospitalists, reflecting continued upcoding, Bessler has taken no action.

8         116.    Since December 2008, Bessler also has received monthly practice management
9   reports from the Southwest Region. These reports have reported that approximately 90 percent
10  of Southwest Region hospitalists' patient encounters have been coded at the highest level. Again
11  despite these monthly alerts of unusually high coding levels, reflecting continued upcoding,
12  Bessler has taken no action.

13        117.    On December 17, 2008, Relator met with Bessler and expressed his concerns
14  about SIP's coding and compliance problems. Bessler repeated his belief that the coding
15  problems were addressed in the budget, referring to the reduction in WRVUs.

16        118.    In March 2009, Relator attended a financial review meeting with Bessler. When
17  the issue of upcoding errors arose, Bessler again focused on the WRVUs used by SIP financial
18  managers. He did not direct any changes to SIP's training programs. At this meeting, Bessler
19  stated that SIP did not have a compliance program in place, and he noted that SIP's legal counsel
20  was concerned about the upcoding problems. Still SIP did not report the upcoding to or
21  reimburse CMS.

22        119.    On this same day, Relator presented a sample Compliance Plan to corporate Chief
23  Medical Officer Smith after Smith stated that a written compliance plan was needed. Smith did
24  not adopt this or any other compliance plan.

25
26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 23
Case No.

010100-11 293740 V1

**HB**

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

**D.     SIP Appears to Have the Same Upcoding Problems With Critical Care Codes**

120.    On December 11, 2008, Schumacher informed Relator that SIP was undergoing an audit from a government-contracted claims administrator.  Relator learned from Cherie Cole that the auditing agency was UPH Health Plan, a contract administrator for the Arizona Medicaid program (Arizona Health Care Cost Containment System, 801 E. Jefferson, Phoenix, AZ 85034, (602) 417-4000).  UPH had audited 25 patient encounters.  Of the 25 charts, SIP was able to produce satisfactory documentation for the codes used to bill just 6 patient encounters.  All of these encounters were billed using critical care codes, 99291-99293.  Upon information and belief, SIP was required to reimburse UPH and rebill corrected claims.

**E.     Medicare and Medicaid Reimbursements to SIP**

121.    Relator estimates, based on 2008 SIP accounting data, that for the period January 1 through December 31, 2008 SIP has overcharged Medicare as a result of the upcoding described above by more than $6 million.  The United States has suffered additional losses because of its payment of the federal portion of inflated reimbursements to SIP under Medicaid and other federally funded health insurance programs.

**COUNT I**

**FALSE CLAIMS ACT**

**31 U.S.C. § 3729(a)(1) and (a)(2)**

122.    Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 121 of this Complaint.

123.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

124.    Defendants submitted bills for payment for hospitalist physician services that were for a higher level of service than actually performed or documented.  Through these and the other acts described above, defendants knowingly presented or caused to be presented false or fraudulent claims, records, and statements for payment or approval to the United States.

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 24
Case No.

010100-11 293740 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1   125.   Through the acts described above, defendants knowingly made, used, or caused to

2   be made or used false records and statements, and omitted material facts, to induce the

3   Government, through the Medicare, Medicaid, and other federally funded health insurance

4   programs, to pay or approve such false or fraudulent claims.

5   126.   The United States, unaware of the falsity and fraudulent nature of the records,

6   statements, and claims made or caused to be made by defendants, paid and continues to pay

7   claims that would not be paid but for defendants' fraud.

8   127.   By reason of defendants' acts, the United States has been damaged, and continues

9   to be damaged, in substantial amounts to be determined at trial.

10   **PRAYER FOR RELIEF**

11   WHEREFORE, Relator, on behalf of himself individually and acting on behalf of the

12   United States prays that judgment be entered against defendants as follows:

13   A.   That defendants be ordered to cease and desist from violating the False Claims

14   Act, 31 U.S.C. §§ 3729 *et seq.*

15   B.   That this Court enter judgment against defendants in an amount equal to three

16   times the amount of damages the United States has sustained because of defendants' actions,

17   plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31

18   U.S.C. § 3729, with interest.

19   C.   That Relator be awarded the maximum amount available under Sections 3730(d)

20   and 3730(c)(5) of the False Claims Act.

21   D.   That Relator be awarded all reasonable expenses that were necessarily incurred in

22   prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C.

23   § 3730(d).

24   E.   And, such other relief shall be granted in the favor of the United States and the

25   Relator as this Court deems just and proper.

26

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 25
Case No.
010100-11 293740 V1

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

DATED this 21st day of May, 2009.

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
Steve W. Berman, WSBA #12536
Jeffrey T. Sprung, WSBA #23607
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

James T. Ratner
LAW OFFICE OF JAMES T. RATNER
P.O. Box 1035
Woodstock, NY 12498
Telephone: (845) 688-5222

Attorneys for Relator Craig Thomas

COMPLAINT FOR VIOLATIONS OF THE
FALSE CLAIMS ACT - 26
Case No.

010100-11 293740 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594